UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PARKER-HANNIFIN CORPORATION and )
PARKER INTANGIBLES LLC,            )
                                   )
            Plaintiffs,            )
                                   )        CASE NO. 1:07-cv-01374-SO
    v.                             )        (*Consolidated with 1:07-CV-01375*)
                                   )
WIX FILTRATION CORPORATION and     )        Judge Solomon Oliver Jr.
CHAMPION LABORATORIES, INC.,       )
                                   )
            Defendants.            )
                                   )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENHANCED DAMAGES FOR DEFENDANTS' WILLFUL INFRINGEMENT

Francis DiGiovanni (Pro Hac Vice)
fdigiovanni@cblh.com
Keith A. Walter, Jr. (Pro Hac Vice)
kwalter@cblh.com
M. Curt Lambert (Pro Hac Vice)
mlambert@cblh.com
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141

Harry D. Cornett, Jr.
hcornett@tuckerellis.com
Benjamin C. Sasse
bsasse@tuckerellis.com
Tucker, Ellis & West
1150 Huntington Bldg.
925 Euclid Avenue
Cleveland, OH 44115
Tel: (216) 592-5000

*Attorneys for Plaintiffs
Parker-Hannifin Corporation and
Parker Intangibles LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

II.  BACKGROUND AND STATEMENT OF FACTS ....................................... 1

III.  THE LEGAL STANDARD FOR ENHANCED DAMAGES ......................... 1

IV.  ARGUMENT ............................................................................................... 2

    A.  Champion Intentionally Copied Parker's Drawings, Parker's Product Specifications, and Parker's Commercial Embodiments ........................ 2

    B.  Champion Had No Good Faith Belief That It Did Not Infringe a Valid Patent ..... 4

    C.  Champion's Litigation and Trial Tactics ................................................ 6

    D.  Champion's Financial Health Weighs In Favor of Enhanced Damages ................. 6

    E.  This Case Cannot Be Considered "Close" ............................................ 7

        1.  This Was a Clear and Convincing Case of Infringement ........................... 7

            a.  The "End Cap" Limitation ............................................... 7

            b.  The "Attached" Limitation ............................................... 8

            c.  The "Central Portion" Limitation ................................... 9

            d.  The "Stationary" Limitation ........................................ 10

            e.  The "Tap Plate" Red Herring ...................................... 10

        2.  This Was Also a Clear and Convincing Case of No Invalidity ................ 11

    F.  Champion's Continuous Infringement Throughout the Course of the Litigation, the Absence of Any Remedial Actions, and Post-Verdict Willful Infringement, Weigh In Favor of Awarding Enhanced Damages ............................................. 14

    G.  Champion's Direct Competitive Role In the Marketplace and Its Vindictive Statements Demonstrate Champion's Motivation to Harm Parker ...................... 14

    H.  Champion Concealed Its Misconduct With the Intent to Harm Parker ................ 15

V.  CONCLUSION ............................................................................................. 15

## TABLE OF AUTHORITIES

Page

**CASES**

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
    836 F.2d 1320 (Fed. Cir. 1987) ................................................................. 14

*Etna Prods. Co., Inc. v. Q Mktg. Group, Ltd.*,
    No. 03 Civ. 3805(SAS), 2004 WL 1769794 (S.D.N.Y. Aug. 6, 2004) ..................... 2

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)........................................................................................ 12

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ..................................................................... 6

*Johns Hopkins Univ. v. Cellpro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ..................................................................... 2

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    372 F.Supp.2d 833 (E.D. Va. 2005) ............................................................... 2

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)...................................................................................... 13

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ........................................................................ 2

*nCube Corp. v. Seachange Int'l, Inc.*,
    313 F. Supp. 2d 361 (D. Del. 2004).............................................................. 14

*Promega Corp. v. Lifecodes Corp.*,
    53 U.S.P.Q.2d 1463 (D. Utah 1999).............................................................. 7

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992) .............................................................. passim

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
    127 F.3d 1462 (Fed. Cir. 1997) .............................................................. 1, 14

*Westvaco Corp. v. Int'l Paper Co.*, Civ. A.
    No. 3:90CV00601, 1991 WL 398677 (E.D. Va. May 7, 1991)........................... 2

**STATUTES**

35 U.S.C. § 284................................................................................1, 2, 15

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

On December 11, 2009, the jury found that Champion Laboratories, Inc. ("Champion")

willfully infringed U.S. Patent No. 5,643,446 ("the '446 patent").  Pursuant to 35 U.S.C. § 284,

Parker-Hannifin Corporation and Parker Intangibles LLC (collectively "Parker") have moved for

an award of treble damages, and file this memorandum in support of their motion.

Champion's willful infringement of the '446 patent and egregious behavior warrant

trebling the damages award.  Champion intentionally and deliberately copied the commercial

embodiment of Parker's patent—as well as drawings and specifications that Parker entrusted to

Champion—despite having no reasonable belief that its actions would not infringe the patent.

The issues of infringement and validity were clearly and convincingly in Parker's favor since the

outset of the infringement, yet Champion willfully infringed Parker's patent for the entire

duration of the litigation and took no remedial actions whatsoever.  Indeed, Champion continues

to market its infringing filters through its online catalog.  Champion's misbehavior as a party to

this litigation, its substantial size, and its healthy financial condition further support enhanced

damages.  Champion's attempts to conceal its infringement, and its statements that it wants to

"hit back hard," "make Racor pay," "win at all costs," and "be the last filter company alive,"

display a shocking motivation to harm Parker.  Treble damages are more than justified.

## II.  BACKGROUND AND STATEMENT OF FACTS

Parker incorporates by reference the Background and Statement of Facts set forth in

Parker's memorandum in support of its motion for a permanent injunction (Dkt. 197).

## III.  THE LEGAL STANDARD FOR ENHANCED DAMAGES

Section 284 of the Patent Statute grants the Court discretion to increase a damages award

up to three times the amount found by the jury or assessed by the Court when willful

infringement is found.  35 U.S.C. § 284.  A finding of willful infringement typically results in

enhanced damages. *See Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1364 (Fed. Cir. 1998) ("[I]t is well established that enhancement of damages may be premised upon a finding of willful infringement."); *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 372 F.Supp.2d 833, 847 n.21 (E.D. Va. 2005) (willfulness "would normally entitle Knorr to [] enhanced damages . . . ."); *Etna Prods. Co., Inc. v. Q Mktg. Group, Ltd.*, No. 03 Civ. 3805(SAS), 2004 WL 1769794, at *14 (S.D.N.Y. Aug. 6, 2004) ("Typically, increased damages are awarded where a defendant has acted with deliberate intent to infringe and cause harm."); *Westvaco Corp. v. Int'l Paper Co.*, Civ. A. No. 3:90CV00601, 1991 WL 398677, at *20 (E.D. Va. May 7, 1991) ("A finding of willful infringement supports and ordinarily leads to increased damages.").

While there is no rigid standard by which a court determines whether or not to treble damages, the Federal Circuit has set forth the following nine factors, known as the *Read* factors, that courts might consider:

(1)   whether the infringer deliberately copied the ideas or design of another;
(2)   whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
(3)   the infringer's behavior as a party to the litigation;
(4)   the infringer's size and financial condition;
(5)   the closeness of the case;
(6)   the duration of the infringer's misconduct;
(7)   remedial action taken by the infringer;
(8)   the infringer's motivation for harm; and
(9)   whether the infringer attempted to conceal its misconduct.

*Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). In this case, these factors conclusively establish that treble damages are appropriate.

## IV.   ARGUMENT

### A.   Champion Intentionally Copied Parker's Drawings, Parker's Product Specifications, and Parker's Commercial Embodiments

Champion intentionally and deliberately copied Parker's invention using every resource

2

at its disposal, thereby satisfying the first *Read* factor. As part of Parker's and Champion's arrangement that Champion would supply Parker's commercial embodiment to GM (beginning in about 2000), Parker provided its engineering drawings and specifications to Champion. Trial Tr. 520-21. However, Parker never authorized Champion to use Parker's drawings and specifications to design a competing filter. Parker's design engineer testified as follows:

| | |
|---|---|
| Question: | Mr. Jensen, did you provide this -- did Racor provide this drawing to Champion, its customer, for the purpose of Champion designing its own fuel filter to compete against Racor? |
| Jensen: | No, of course, not. |

Trial Tr. 521. Nonetheless, Champion's engineers testified that they intentionally used Parker's drawings and specifications to design the infringing filter:

| | |
|---|---|
| Watson: | I was able to use the Racor product as guidelines for fit with the base, that the filter is intended to be used on. |
| | * * * * * |
| Question: | Champion did take those drawings that were from Racor, and Champion did take information off of those drawings and use it as a guide, right? |
| Gaither: | We used it as a guide, yes. |
| | * * * * * |
| Question: | So when you designed your filter, you didn't start from a blank. You actually took the Racor product and made some changes, right? |
| Watson: | I took the geometry and modified it. [] I modified the drawing I had created. |
| Question: | The drawing you had created was a drawing of the Racor product. |
| Watson: | That's correct, sir. |

Trial Tr. 862, 1018, 1084-85.

Champion's own documents display Champion's flagrant copying of Parker's drawings and specifications. About 16 months into the project to design the infringing filter, Champion copied an entire table of specifications from Parker's engineering drawings, and even enlarged it to ensure that every detail of Parker's specifications could be copied. *Id.* at 1086-87; Pl. Ex. 384.

Not only did Champion copy Parker's drawings and specifications, Champion also used

3

Parker's commercial embodiment as a model for their replica filter:

| | |
|---|---|
| Watson: | I took the Racor product and I benchmarked it by testing it to my procedures, so I would then be able to compare my results to the results of the benchmarking I had done on the Racor products. |
| Question: | And how did you get these filters to benchmark? |
| Watson: | I walked out in the warehouse and got the Racor products. |

Trial Tr. 1066. Flagrant copying is apparently accepted practice at Champion, as Champion has no written policy with regard to respecting the intellectual property of others. *Id.* at 1074. The numerous and unapologetic instances of Champion's deliberate copying justify treble damages.

### B.   Champion Had No Good Faith Belief That It Did Not Infringe a Valid Patent

The second *Read* factor looks to "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." The jury found by clear and convincing evidence that Champion sold the infringing filters despite an objectively high likelihood that its actions infringed the '446 patent, and that this objectively high likelihood of infringement was either known or so obvious that it should have been known to Champion. Jury Instruction No. 29 (Dkt. 179). The jury's finding was well founded, as confirmed by the Court's post-trial Order on Champion's motion for JMOL regarding willfulness (Dkt. 193).

Champion began designing its infringing filter in late 2003 or early 2004 (Trial Tr. 952, 1013), became aware of the '446 patent in early 2004 (*id.* at 943-44, 952, 1013), and began producing the infringing filter in late 2005 (*id.* at 1013). Champion did not present any evidence that it relied on the advice of a competent attorney during this 2-year design process. Instead, Champion's only evidence of a purported belief that it did not infringe the '446 patent was the inadequate lay opinions of John Gaither, Champion's vice president of engineering, and William Watson, the infringing filter's designer (who testified more about his years in Hollywood as a musician (*id.* at 1047-49) than about his analysis of Parker's patent (*id.* at 1071)). Neither

4

Gaither nor Watson has any training in patent law. *Id.* at 1026. Indeed, Watson conceded that he is not competent to render opinions concerning infringement of the '446 patent:

| | |
|---|---|
| Question: | Now, when you first contacted the attorneys with these issues that I believe you said you needed help with, what issues were those? |
| Watson: | There were often long statements in these patents that included double negatives; they are so long and so detailed in legal language that I don't have confidence that I am interpreting them as they are intended. |

\* \* \* \* \*

| | |
|---|---|
| Watson: | Well, I did the analysis, of course, after I got my hands on the patents, and after I had thoroughly reviewed the patents and realized that I wasn't comfortable with interpreting all the legal terms in the patents. |

\* \* \* \* \*

| | |
|---|---|
| Question: | And in fact, you don't consider yourself comfortable in interpreting all legal terms in patents, right? |
| Watson: | That's correct. |

*Id.* at 948, 949, 1086.

There is no evidence that Watson construed a single term in any claim of the '446 patent, or whether he considered that an "end cap" could be a multi-component structure, components could be separated by intervening objects and still be "attached," or a projection could be "stationary" when the filter is sold or used during normal operation. Watson also did not consider whether a projection could be "stationary" under the doctrine of equivalents if the filtration media could potentially move if the vehicle were to be shaken dramatically. Indeed, he admitted that this abnormal situation would not inhibit the filter from functioning properly. *Id.* at 1083. There was also no evidence that Watson conducted a validity analysis. Significantly, Watson never memorialized his perfunctory analysis in any document. *Id.* at 949.

Gaither testified that he has "the ultimate responsibility for all product design" and "the ultimate decision as to whether or not we build a given construction," and that "the buck stops with [him] in terms of infringement." *Id.* at 1014. Yet, he simply relied on Watson's undocumented analysis. *Id.* at 1013-15. In short, neither Watson nor Gaither engaged in a claim

5

construction, literal infringement, doctrine of equivalents, or validity analysis. Champion's push to "move as quickly as possible" to make significant profits on Parker's invention (*id.* at 1088; Pl. Ex. 47) no doubt contributed to the lack of actual analysis by Champion.

Champion is required to point to prelitigation conduct in order to show a good faith belief that it did not infringe a valid patent. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) ("[I]n ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct."). It cannot do that, because Champion had *no legitimate basis* for any good faith belief it did not infringe Parker's '446 patent, as the jury clearly found, and as described further in § IV.E, *infra*. Simply put, Champion knew of the '446 patent but failed to produce any evidence of independent conception of its infringing filter or any other evidence—opinions of counsel or otherwise—to show a good faith belief in a non-infringement or invalidity position.

**C.      Champion's Litigation and Trial Tactics**

The third *Read* factor relates to "the infringer's behavior as a party to the litigation." As detailed in Parker's motion to declare this an exceptional case and for attorney fees (incorporated herein by reference), Champion's behavior justifies trebling the damages.

**D.      Champion's Financial Health Weighs In Favor of Enhanced Damages**

The next *Read* factor examines "the infringer's size and financial condition." Champion is a large company (Lambert Decl. ¶ 5) that is owned by The Carlyle Group, a private investment firm with more than $70 billion in assets (*id.* at ¶ 6; Trial Tr. 1016). Champion has numerous facilities worldwide, carries 4,000 different types of filters, ships about a half-million filters each day, and makes and sells "millions and millions of filters" each year. Trial Tr. 321, 894-95, 900.

Champion enjoyed a windfall financial benefit from its willful infringement. George Starring, Champion's Director of OEM Sales, testified that the profit on the infringing filter was a whopping 150%. *Id.* at 1042. Champion has little incentive to respect the patent rights of

others, if infringement still remains profitable. *See Promega Corp. v. Lifecodes Corp.*, 53 U.S.P.Q.2d 1463, 1477 (D. Utah 1999) (finding that the infringer was capable of paying treble damages based on evidence that the infringer enjoyed considerable success in the relevant market). The imposition of treble damages for Champion's willful infringement is warranted.

### E.      This Case Cannot Be Considered "Close"

The next *Read* factor looks at the "closeness of the case." The jury found that Champion's filters infringed both of the asserted claims of the '446 patent, literally and under the doctrine of equivalents, no matter how one views the filter (either from a single-component or a multi-component end cap perspective), and that the evidence of Champion's infringement was clear and convincing (Jury Instruction No. 29 (Dkt. 179)). If the jury thought infringement was "close," the jury would not have found *clear and convincing* evidence of willful infringement.

#### 1.      This Was a Clear and Convincing Case of Infringement

##### a.      The "End Cap" Limitation

The Court construed the claim term "end cap" as "the component or components fastened, joined, connected, or affixed to the ends of the filter." Claim Construction Order 19, 26-27 (Dkt. 50). Because the '446 patent encompasses a single-component and a multi-component end cap, Parker, as well as Dr. Garris, conducted the infringement analysis from both perspectives. Trial Tr. 641-44, 739-40, 744. Parker contended, and Dr. Garris concluded, that claims 24 and 25 were infringed under a multi-component end cap perspective, and claim 24 was also infringed under a single-component end cap perspective. *Id.* at 596-658, 662, 740-42.

Champion and its expert, Mr. Mahon, never considered whether the infringing filter included a multi-component end cap. *Id.* at 1195. Therefore, Champion and Mahon never compared the Court's entire claim construction to the accused filter, a black-letter-law

prerequisite to an infringement analysis.[1] Instead, Champion and Mahon *unilaterally deleted* the phrase "or components" from the Court's claim construction, and *rejected* the Court's construction. *Id.* at 1209 ("I cannot accept a multi-component end cap."); 1417.

The case was never close on this issue. Champion put on no defense to Parker's claim that the infringing filter included *components* (plural) comprising an end cap.

### b. The "Attached" Limitation

The Court also construed the claim term "attached" as "fastened, joined, connected, or affixed." Claim Construction Order 19, 26-27 (Dkt. 50). Parker contended, and Dr. Garris concluded, that the multi-component end cap was fastened, joined, connected, or affixed to the filtration media by means of both chemical and mechanical attachment to the filtration media. Trial Tr. 609, 739-40, 744-45, 1415-16. As for the perspective of a single-component end cap, Dr. Garris' unrebutted conclusion was that it was fastened, joined, connected, or affixed to the filtration media by means of chemical bonding. *Id.* at 643-47.

Champion and Mahon rejected the Court's construction of the claim term "attached," and rewrote the construction to include an additional limitation that there must be direct and intimate "contact" between the filtration media and all of the end cap's components:

| Question: | I believe you testified that the black plastic piece is not part of the end cap because it doesn't contact the media, right? |
|---|---|
| Mahon: | Yes. |
| Question: | Where is the word "contact" in here in the Judge's construction of end cap attached to said media? |
| Mahon: | It doesn't – does not appear. |

*Id.* at 1214. Once again, this analysis is improper.[2] Champion's argument that "they don't

---

[1] Mahon conceded that Champion's filter met all of the disputed limitations of claim 25 under a multi-component end cap perspective. Trial Tr. 1194, 1204-08.

[2] During claim construction, Champion represented to the Court that the word "connected" encompasses "objects *not directly touching*, but separated by intervening objects" (Def. Op. Claim Constr. Br. 9 (Dkt. 38) (emphasis added)). Moreover, the Court stated that "while one

touch" (*id.* at 1460) is meritless in view of the Court's construction of the claim term "attached." Indeed, Champion was so brazen as to argue—in complete contradiction to patent law and the Court's claim construction—that a "ten cent washer" prevents contact and thus prevents infringement. *See id.* at 1460 ("And the irony here is that a little ten cent part prevents them from getting six million dollars, because they are separated."). The result of Champion's folly was that it never conducted a proper infringement analysis regarding the claim term "attached."

Like the claim term "end cap," the case was never close on this issue. Champion offered no defense against Parker's claim that the infringing filter's multi-component end cap was "attached" to the filtration media by mechanical and chemical means.

c. The "Central Portion" Limitation

The Court also construed the claim term "central portion" as "the portion centrally located in the radial direction." Claim Construction Order 25, 27 (Dkt. 50). Parker contended, and Dr. Garris concluded, that the infringing filter has a central portion under a single-component and a multi-component end cap perspective. Trial Tr. 619-22, 634-35, 649-52.

Mahon testified that the infringing filter included a central portion spanning the end cap wall, according to claims 24 and 25, under the multi-component end cap perspective. *Id.* at 1205. As for the single-component end cap perspective, Champion and Mahon chose to rewrite the Court's claim construction (and the express language of claim 24) and import a requirement that the central portion be *part of the end cap*:

| | |
|---|---|
| Question: | Now, in Claim 24, the central portion doesn't need to be part of the end cap, does it? |
| Mahon: | In my belief, it does. |

Trial Tr. 1206; *see also id.* at 1115 (the central portion "of the end cap").

---

component of the end cap may not itself touch the filter media, the fact that the purported end cap *as a whole* is joined to the media is sufficient to satisfy [the "attached"] limitation." Order Denying Summary Judgment 27-28 (Dkt. 110) (emphasis added).

This was the third instance that Champion rejected the Court's claim construction. Champion and Mahon never conducted a proper infringement analysis for the claim term "central portion." The case was never close on this issue.

### d.     The "Stationary" Limitation

Parker contended, and Dr. Garris concluded, that the multi-component end cap of the Champion filter literally infringed claim 25 because the actuating projection and end cap wall were part of a unitary molded part, and was therefore "stationary." Trial Tr. 621-22. Mahon agreed with Parker and Dr. Garris. *Id.* at 1194.   Parker also contended, and Dr. Garris concluded, that claim 24 was literally infringed under single-component and multi-component end cap perspectives because the filter's projection was stationary relative to the media. *Id.* at 636-38, 653-54, 740-42. Mahon agreed that the infringing filter, as sold, included a projection that was stationary relative to the media. *Id.* at 1193.

Parker further contended, and Dr. Garris concluded, that claim 24 was infringed because the filter's projection was stationary under the "function-way-result" doctrine of equivalents test. *Id.* at 662-66, 671-72, 740-42. Mahon did not even perform a "function-way-result" analysis. *Id.* at 1204; 1390, 1423-24. Moreover, both Mahon and Watson testified that any movement of the filtration media does not compromise the function of the filter. *Id.* at 1083, 1121.

Champion offered no defense to Parker's claim that the infringing filter has a projection that is stationary (i) relative to the media when Champion sells and offers to sell the filter; (ii) relative to the media under normal operating conditions; and (iii) relative to the end cap wall under all circumstances. The case was never close on this issue.

### e.     The "Tap Plate" Red Herring

Throughout this litigation, Champion advanced a theory of non-infringement based on a term in *unasserted* claims of the '446 patent. Champion argued that the black plastic piece of the

infringing filter was a "tap plate," despite the fact that the piece lacked a central threaded opening for threadably engaging a threaded nipple portion, as required by the '446 patent. *Id.* at 538-39, 616-18; '446 patent col. 12:31-12:33 (Jt. Ex. 1). Mahon confirmed that a filter's inner central opening is the proper location for tap plate threads (Trial Tr. 1190-92; Pl. Ex. 354 (indicated with red lines)), and that there are *no threads* in the inner central opening of the infringing filter (Trial Tr. 1192-93). Watson also testified that there were no threads in the inner central opening of the infringing filter. *Id.* at 1075-77. Watson was also caught at trial when he pointed to the end cap and said "[w]e call that a tap plate" (*id.* at 1060), only to later admit on cross-examination that he never contemporaneously called the piece a "tap plate" (*id.* at 1075-76). Thus, Mahon and Watson both confirmed that the infringing filter has no tap plate.[3]

Champion's non-infringement positions were incomplete, inconsistent with its own engineers' and expert's testimonies, irrelevant, and improperly based on claim constructions that differed significantly from the Court's constructions (which Champion has repeatedly rejected and rewritten during this litigation). This was never a close case of infringement.

### 2. This Was Also a Clear and Convincing Case of No Invalidity

During this litigation, Champion contended that the asserted claims of the '446 patent were invalid using virtually every available statutory provision, all of which were either withdrawn, denied, stricken by the Court, or rejected by the jury, as follows:[4]

- § 102(b) (anticipation): stricken by the Court
- § 103 (obviousness): rejected by the jury (see below)
- § 112 ¶ 1 (best mode): denied by the Court on summary judgment

---

[3] The question of whether the infringing filter has a tap plate at all is entirely irrelevant. Infringement is established when an accused device includes each and every limitation of the asserted claims (as opposed to limitations in *unasserted* claims).

[4] The illegitimacy of Champion's stricken, denied, and voluntarily withdrawn defenses were described in Parker's opposition to Champion's summary judgment motion (*see* Dkt. 66), and are incorporated herein by reference.

- § 112 ¶ 1 (written description):  voluntarily withdrawn
- § 112 ¶ 1 (enablement):  voluntarily withdrawn
- § 112 ¶ 2 (indefiniteness):  denied by the Court on summary judgment

Only two of these defenses—written description and obviousness—made it to trial.

Champion's written description defense ran afoul of the long-standing Federal Circuit precedent that a patent is not required to disclose all possible embodiments. Trial Tr. 1317-22. Champion presented no expert testimony in support of its theory. It could not, since Mahon never read the prosecution history of the '446 patent (*id.* at 1196), a virtual prerequisite for conducting a written description analysis. Instead, Champion argued that a 1999 drawing of an embodiment of the '446 patent somehow proved that Parker did not possess the invention disclosed in the '446 patent. *Id.* Champion's theory was exposed as baseless, and the Court sustained Parker's objection to the 1999 drawing for this irrational purpose. *Id.* at 1322. Champion thereafter voluntarily withdrew the defense. *Id.* at 1334-35.

Champion's obviousness defense was equally weak, and the analysis performed by Champion and Mahon did not even come close to conforming with the test set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). First, Champion failed to rebut Parker's showing that numerous elements of the asserted claims of the '446 patent were entirely missing from the Brown reference, the Takashi reference, and the Brown-Takashi combination (assuming *arguendo* that such a combination would even be possible). Trial Tr. 1178; 1283-88, 1293, 1297, 1428-32. For example, Champion completely ignored the absence of the preamble limitation in the Brown and Takashi references, and did not even indicate that the preamble was a limitation on its demonstrative exhibit displaying the asserted claims. *Id.* at 1177-78, 1428-29, 1463. Mahon also had to be repeatedly impeached with his deposition testimony and expert report regarding the numerous missing elements in the Brown and Takashi references. *See, e.g.,*

*id.* at 1179-81 (flatly contradicting—not once, but twice—his deposition testimony and expert report stating that there is no "actuating projection" disclosed in the Brown reference). It is black letter law that a combination of references does not render a patent invalid under § 103 if the combination does not disclose all the claim limitations of the patent. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007) (combination must, *inter alia*, disclose all limitations).

Second, Champion's defense was based on a combination of two references, one of which Mahon did not understand or even read when forming his opinions. Trial Tr. 1160, 1186 (admitting his analysis was "foolish," "imprudent," a "mistake," and "incorrect").[5] Thus, Champion and Mahon failed to analyze the scope and content of the prior art, or set forth the differences between the prior art and the claims of the '446 patent, as required by *Graham*.

Third, Champion and Mahon did not conduct the obviousness analysis from the perspective of a person of ordinary skill in the art (*id.* at 1190, 1427-28), as required by *Graham*.

Fourth, Champion and Mahon failed to consider—much less rebut Parker's showing of (*id.* at 1303-11)—numerous secondary considerations of non-obviousness, the fourth *Graham* factor. In fact, Mahon admitted that a person of ordinary skill in the art would not place a ball check valve (such as the one disclosed in the Takashi reference) in the bypass circuit of the Brown reference, and that a rubber seal is not typically used as an actuating projection. *Id.* at 1188. In other words, Mahon admitted that the references *taught away from* the proposed combination, which is an indication of non-obviousness.

None of Champion's invalidity contentions were meritorious. In fact, only one of Champion's invalidity defenses—obviousness under § 103—survived long enough to be

---

[5] Mahon's reliance solely on the pictures of the Takashi reference was also foolish. He opined that the fluid flowed in the opposite direction and even through solid walls. *Id.* at 1183-86; Pl. Ex. 355.

presented to the jury, and it had as many flaws as Champion's other ill-founded defenses. This was never a close case of invalidity.

**F.  Champion's Continuous Infringement Throughout the Course of the Litigation, the Absence of Any Remedial Actions, and Post-Verdict Willful Infringement, Weigh In Favor of Awarding Enhanced Damages**

The next two *Read* factors examine "the duration of the infringer's misconduct" and any "remedial action taken by the infringer." Champion began designing the infringing filter in late 2003 or early 2004 (*id.* at 952, 1013), was aware of the '446 patent in early 2004 (*id.* at 943-44, 1013, 1071), and began producing the infringing filter in late 2005 (*id.* at 1013). Champion's infringement continued after Parker put Champion on actual notice of infringement (Jt. Ex. 11, 15; Pl. Ex. 13, 359; Trial Tr. 468-69), and even after Parker filed suit (Jt. Ex. 15; Pl. Ex. 359). Incredibly, Champion *continues to willfully infringe* Parker's '446 patent by offering to sell the infringing filter through its online catalogs. Lambert Decl. ¶¶ 3, 4.

For six years *and counting*, Champion has been willfully infringing Parker's '446 patent. Champion's disregard for the jury's verdict justifies trebling the damages. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987) (affirming double damages when infringer "continued to manufacture and sell infringing devices even after the commencement of the suit"); *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997) (affirming trebling damages where infringer "engaged in infringing activities for five years" after being contacted by plaintiff).

**G.  Champion's Direct Competitive Role In the Marketplace and Its Vindictive Statements Demonstrate Champion's Motivation to Harm Parker**

The next *Read* factor looks to "the infringer's motivation for harm." This factor favors enhanced damages where the parties are direct competitors in a competitive market. *See nCube Corp. v. Seachange Int'l, Inc.*, 313 F. Supp. 2d 361, 390-91 (D. Del. 2004) (direct competitors in

a highly competitive market "militates in favor of enhanced damages"). Champion characterizes the market as "horribly competitive" (Trial Tr. 905-06) and insists that it and Parker are "fierce competitors" (*id.* at 314). Moreover, Champion's overt statements show—graphically and explicitly—that Champion intended to harm Parker in a most malicious and vindictive way:

- "I want to hit back hard." Pl. Ex. 387.
- "I want to make Racor pay." *Id.*
- "We have to win at all costs." Pl. Ex. 112.
- "Our goal at Champion is to be the last filter company alive in the United States." Trial Tr. 903.

Champion's statements leave nothing to the imagination. Champion intended to harm Parker.

### H. Champion Concealed Its Misconduct With the Intent to Harm Parker

The final *Read* factor is whether the infringer attempted to conceal its misconduct. Champion actively concealed its misconduct from the very beginning, and did so at least in part to cause financial harm to Parker (thereby also implicating the eighth *Read* factor). When Champion created its infringing filter, Champion never told Parker (with whom it had an ongoing purchaser-supplier relationship) of its intent to launch the infringing filter. Parker was "shocked" when Parker's customers suddenly stopped purchasing from Parker, and instead were buying Champion's infringing filter. *Id.* at 460-61, 463, 466. Champion's concealment was done with full knowledge that being saddled with excess inventory is harmful. *Id.* at. 901. Champion's intent to disrupt Parker's supply chain succeeded. *Id.* at 460-62, 466-67. Such harmful intent warrants the imposition of trebled damages.

### V. CONCLUSION

For the foregoing reasons, the Court should enhance the damages awarded by the jury by trebling the damages in accordance with 35 U.S.C. § 284.

Dated: January 14, 2010                By: */s/ Francis DiGiovanni*

Francis DiGiovanni (Pro Hac Vice)
fdigiovanni@cblh.com
Keith A Walter, Jr. (Pro Hac Vice)
kwalter@cblh.com
M. Curt Lambert (Pro Hac Vice)
mlambert@cblh.com
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614

Harry D. Cornett, Jr.
hcornett@tuckerellis.com
Benjamin C. Sasse
bsasse@tuckerellis.com
Tucker, Ellis & West
1150 Huntington Bldg.
925 Euclid Avenue
Cleveland, OH 44115
Tel.: (216) 592-5000
Fax: (216) 592-5009

*Attorneys for Plaintiffs
Parker-Hannifin Corporation and
Parker Intangibles LLC*

744572

## CERTIFICATE OF SERVICE

I, M. Curt Lambert, hereby certify that on January 14, 2010, a true copy of the foregoing document was filed electronically with the Clerk of Court using CM/ECF, which will send notification that such filing is available for viewing and downloading from CM/ECF, and was served upon the following counsel of record in the manner listed:

**VIA EMAIL:**

Seymour Rothstein (Pro Hac Vice)
Joseph M. Kuo (Pro Hac Vice)
Dennis H. Ma (Pro Hac Vice)
Alissa A. Digman (Pro Hac Vice)
Olson & Cepuritis, Ltd.
20 North Wacker Drive, 36th Floor
Chicago, IL 60606-3181
Tel. (312) 580-1180
Fax. (312) 580-1189
srothstein@olsonip.com
jkuo@olsonip.com
dma@olsonip.com
adigman@olsonip.com

Brian W. Lewis (Pro Hac Vice)
Paul T. Olszowka (Pro Hac Vice)
Robert L. Wagner (Pro Hac Vice)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. (312) 201-2000
Fax. (312) 416-4805
Lewis@wildman.com
olszowka@wildman.com
wagner@wildman.com

Michael J. Schaengold (Pro Hac Vice)
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
Tel. (202) 457-6523
Fax. (202) 457-6315
mschaengold@pattonboggs.com

**VIA EMAIL AND HAND DELIVERY:**

Gary A. Corroto
Edmond J. Mack
Megan J. Frantz
Tzangas, Plakas & Mannos
220 Market Avenue, S - 8th Floor
Canton, OH 44702
Tel. (330) 455-6112
Fax. (330) 455-2108
gcorroto@lawlion.com
emack@lawlion.com
mfrantz@lawlion.com

*/s/ M. Curt Lambert*
M. Curt Lambert (Pro Hac Vice)
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614
mlambert@cblh.com
*Attorney for Plaintiffs*
*Parker-Hannifin Corporation and*
*Parker Intangibles LLC*